**BERWIND–WHITE COAL MINING CO., Inc. v. CENTRAL COAL CO., Inc.**

**THE EUREKA NO. 31.**

**THE PITTSBURGH.**

United States District Court
S. D. New York.

Oct. 18, 1948.

656

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for libelant.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for respondent.

Burlingham, Veeder, Clark & Hupper, of New York City (Jas. J. Conran, of New York City, of counsel), for claimant.

KENNEDY, District Judge.

On July 13, 1944, libelant's barge Eureka #31 was the off-shore vessel in a tier of four coal barges[1] moored to a dock, belonging to Central Coal Co., Inc. (Central) at West 30th Street and the North River. Eureka #31 at that time was fully laden witth coal. She was lying with her stern up stream. On her port side was the barge McLain No. 2. Just in shore of the latter was the barge McLain No. 6. The in-shore barge was W. S. Butts, whose cargo had been discharged. At 6:10 P.M. on that day it was decided to wind the tier around so as to place Eureka #31 alongside of the dock and under the diggers. The winding operation was conducted as follows:

A wire power cable with a scope of about 150 feet was run from an engine house located on the dock to the upstream in-shore corner of W. S. Butts. The fasts between the in-shore barge and the dock were cast off and a strain was taken on the cable. This swung the tier around clockwise. When the tier was at right angles, or almost so, to the shore line, the power cable was then transferred to the starboard stern corner of Eureka #31 and a strain maintained, which caused the tier to continue to swing clockwise.[2] When the starboard side of Eureka #31 was almost parallel to the shore, the power cable was transferred to the barge's starboard quarter cleat, and on shore the cable was rove through a sheave to the northward of the engine house. This caused the cable to act as a quarter spring, bringing the whole tier broadside into the same berth, this time Eureka #31 being the in-shore barge with her starboard side to the dock. One of libelant's claims is that during this operation, and at approximately 6:30 P.M., Eureka #31 sustained damage to her starboard stern quarter, which eventually caused her to sink at her mooring at about 9:30 P.M. The bargee of Eureka #31 testifield that he felt a bump when she docked but, from his testimony, I gathered that he did not consider it particularly violent. He pumped the bilges, and after five or six minutes got them dry, whereupon he says he went to visit on another barge (Eureka #72), which was alongside the dock and ahead of his own barge. Some time later, and probably at 7:30 P.M., the bargee of Eureka #31 says he walked up the dock on a personal errand and then noticed that his barge was listed slightly to starboard. He used his pump for ten minutes but thereafter could not get it to function. Thereupon, after vain attempts to borrow a pump, he went to a telephone and notified his owners. In some manner not clearly described, a Moran tug arrived at the scene at about 8:30 P.M. By this time Eureka #31 was listing badly. The Moran tug used her syphon. Still later, and shortly after 9:00 P.M., a runner representing Berwind-White

---

[1] The total width of the barges was approximately 110 feet.

[2] There were no other lines used during the shifting operation.

says he appeared with emergency pumps, but by this time it was too late. This man places the sinking of Eureka #31 at 9:15 P.M. He did not observe the condition of the barge at that time, but three or four days later after her cargo had been discharged and she was afloat, he noticed severe damage to the starboard stern corner of the barge, notably at the starboard end of the top log and of the three planks below it, and also to the starboard ends of the end planks down along the rake.

So far as the controversy lies between libelant and respondent Central, the question is whether the latter, a consignee, has been shown to be guilty of negligence, or, even if so, whether, as Central asserts and must prove, the loss of the barge was actually caused by her own unseaworthiness.

Originally, it was claimed that there was fault on the part of the tug Pittsburgh, in that after the completion of the winding operation the Pittsburgh drilled out the then off-shore barge (W. S. Butts), and that there was some causal connection between this operation and the damage to Eureka #31. However, at the trial I dismissed the libel against Pittsburgh's claimants; there was a complete absence of proof of fault. Thus, as I have said, the controversy resolves itself into one between the libelant and Central, and, under the proof offered, the first critical issue to be determined is whether Central was guilty of negligence in the winding operation. The answer to that question depends in turn upon whether the operation was so conducted that libelant's barge was carelessly subjected to a blow more violent than any which harbor craft reasonably fit for the service would be expected to survive.

I believe that on this point the burden of explanation, at least, is upon Central, since, undoubtedly, it was a bailee. C. F. Harms Co. v. Erie R. Co., 2 Cir., 1948, 167 F.2d 562. Actually, it is necessary for me to find that on the whole case the proof preponderates in favor of Central: it satisfies me that the winding operation was in fact conducted without any unusual violence. It is not, therefore, strictly necessary to explore the occurrence further, and to decide whether or not Eureka #31 was unseaworthy, as Central claims and is

bound to prove. But, under the proof, the barge had lain at her berth for some thirteen days without incident. Even though she was fairly old, there was no showing of any specific defect, with the possible exception of the bad condition of her pump (which, concededly, failed to function). But it is highly likely that this failure is to be explained on the ground that Eureka #31 was taking water so fast that no pump could be expected to cope with the condition as it existed. On this record, I could make no specific finding of unseaworthiness on the part of Eureka #31 if, as I believe, the burden was on Central to establish that condition.

The result of all this is that the proof preponderates in Central's favor on the question whether that respondent was guilty of any negligence. This leads to a dismissal of the libel, even though it is impossible to say what the proximate cause of the disaster was.

I have filed findings of fact and conclusions of law.